**CASE NO. 21-35480**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

SAVE THE BULL TROUT, et al.,
Appellants,

v.

MARTHA WILLIAMS, et al.,
Appellees.

---

# AMICUS BRIEF OF CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, AND SIERRA CLUB IN SUPPORT OF APPELLANTS AND IN FAVOR OF REVERSAL

---

ELIZABETH FORSYTH
Earthjustice
810 3rd Ave #610
Seattle, WA 98104
Tel: (206) 531-0841
Fax: (206) 343-1526

TIMOTHY J. PRESO
Earthjustice
313 E. Main St.
Bozeman, MT 59715
Tel: (415) 217-2000
Fax: (415) 217-2040

*Attorneys for*
*Conservation Amici*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 29(a)(4)(A), amici curiae Center for Biological Diversity, Defenders of Wildlife, and Sierra Club confirm that they have no parent companies and that no publicly held corporations own 10 percent or more of any of the organizations.

# TABLE OF CONTENTS

INTEREST OF AMICI ........................................................................................1

SUMMARY OF ARGUMENT ..........................................................................4

THE IMPORTANCE OF RECOVERY PLANS AND SETTING APPROPRIATE DELISTING CRITERIA ..............................................................6

I. RECOVERY PLANS ARE A CRITICAL REQUIREMENT OF THE ENDANGERED SPECIES ACT. ......................................................................6

II. SETTING APPROPRIATE DELISTING CRITERIA IS KEY TO A MEANINGFUL RECOVERY PLAN..........................................................10

ARGUMENT ..........................................................................................................17

CONCLUSION.......................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aina Nui Corp. v. Jewell*,
52 F. Supp. 3d 1110 (D. Haw. 2014)....................................................11

*Alaska v. Lubchenco*,
723 F.3d 1043 (9th Cir. 2013) ..............................................................10, 11

*Ass'n of Cal. Water Agencies v. Evans*,
386 F.3d 879 (9th Cir. 2004) ..............................................................23

*Bennett v. Spear*,
520 U.S. 154 (1997)..............................................................................23

*Ctr. for Biological Diversity v. Haaland*,
No. 4:18-CV-00047-TUC-JGZ, 2021 WL 4806846 (D. Ariz. Oct.
14, 2021) ..............................................................................................21

*Ctr. for Biological Diversity v. Zinke*,
399 F. Supp. 3d. 940 (D. Ariz. 2019) .................................................20, 21

*Ctr. For Native Ecosystems v. Cables*,
509 F.3d 1310 (10th Cir. 2007) ...........................................................11

*Defs. of Wildlife v. Babbitt*,
130 F. Supp. 2d 121 (D.D.C. 2001)..............................................*passim*

*Friends of Blackwater v. Salazar*,
691 F.3d 428 (D.C. Cir. 2012)......................................................18–19, 24, 25

*Fund for Animals v. Babbitt*,
903 F. Supp. 96 (D.D.C. 1995)......................................................*passim*

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
378 F.3d 1059 (9th Cir. 2004) ..............................................................6

*Me. Cmty. Health Options v. United States*,
140 S. Ct. 1308 (2020)..........................................................................22

*Save the Bull Trout v. Williams*,
No. CV-19-184-M-KLD, 2021 WL 2551412 (D. Mont. June 22, 2021) ....................3, 20, 22

*Sw. Ctr. for Biological Diversity v. Babbitt*,
No. 98-372 TUC JMR, 1999 WL 33438081 (D. Ariz. Sept. 3, 1999) ....................19

*Sw. Ctr. For Biological Diversity v. Bartel*,
470 F. Supp. 2d 1118 (S.D. Cal. 2006)....................11

*United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*,
837 F.3d 1055 (9th Cir. 2016) ....................22–23

*United States v. Monsanto*,
491 U.S. 600 (1989)....................22

*Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*,
139 S. Ct. 361 (2018)....................23

*Wildearth Guardians v. Salazaar*,
No. 09-CV-1893, 2009 WL 6443120 (S.D. Tex. Dec. 7, 2009) ....................19–20

**STATUTES AND LEGISLATIVE MATERIALS**

16 U.S.C. § 1531....................6

16 U.S.C. § 1532....................6

16 U.S.C. § 1533....................*passim*

Pub. L. No. 95-632, 92 Stat. 3751 (1978)....................7

Pub. L. No. 100-478, 102 Stat. 2306 (1988)....................9

S. Rep. No. 100-240 (1987)....................8

**REGULATIONS AND ADMINISTRATIVE MATERIALS**

50 C.F.R. § 424.11 ....................19

72 Fed. Reg. 37,346 (July 9, 2007)....................10

## OTHER AUTHORITIES

Daniel J. Rohlf, *The Endangered Species Act: A Guide to Its Protections and Implementation* (1989) ........................................................7–8

Intergovernmental Science-Policy Platform on Biodiversity and Ecosystem Servs., *Summary for Policymakers of the IPBES Global Assessment Report on Biodiversity and Ecosystem Servs.* (2019) .......................7

J. Alan Clark, et al., *Improving U.S. Endangered Species Act Recovery Plans: Key Findings and Recommendations of the SCB Recovery Plan Project*, 16 Conservation Biology 1510 (Dec. 2002) ..................9

Jason M. Patlis, *Recovery, Conservation, and Survival Under the Endangered Species Act: Recovering Species, Conserving Resources, and Saving the Law,* 17 Pub. Land & Resources L. Rev. 55 (1996)..........................................................................................14

Jordan Curnutt, *Animals and the Law: A Sourcebook* (2001) ................................15

Nat'l Marine Fisheries Serv. & U.S. Fish & Wildlife Serv., *Interim Endangered and Threatened Species Recovery Planning Guidance, Version 1.3* § 1.3.2 (2010) ..........................................................13, 14

U.S. Fish and Wildlife Service, *Grizzly Bear, Ecosystem-Specific Recovery Materials* .....................................................................................15

U.S. Fish and Wildlife Service, *Recovery Plan for the Coterminous United States Population of Bull Trout* (2015)...........................................16, 17

U.S. Fish and Wildlife Service, *Recovery Plan for the Sonoran Pronghorn* (2016) ....................................................................................15–16

U.S. Fish and Wildlife Service, *Report to Congress on the Recovery Program for Threatened and Endangered Species* (1996)............................7, 16

## INTEREST OF AMICI

Amici curiae Center for Biological Diversity, Defenders of Wildlife, and Sierra Club ("Conservation Amici") submit this brief to urge the Court to reverse the district court's holding in this case that the U.S. Fish and Wildlife Service ("Service"), when designing the recovery/delisting criteria required by section 4(f) of the Endangered Species Act ("ESA") in a species' recovery plan, may ignore the statutory delisting factors delineated under section 4(a) of the ESA that are relevant to the species in question. Collectively representing millions of members and supporters, and having worked for decades across the United States to ensure protection of imperiled species under the ESA, Conservation Amici have an acute interest in ensuring that the benefits of this landmark environmental law are not eroded. The decision below threatens to undermine this body of work and the interests of Conservation Amici's members.[1]

The Center for Biological Diversity ("Center") is a non-profit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center was founded in 1989 and is based in Tucson, Arizona, with offices throughout the country. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the

[1] The Parties to this appeal have consented to the filing of this amicus brief. No party's counsel authored this brief in whole or in part, and no person other than Conservation Amici contributed money to fund preparing or submitting the brief.

brink of extinction. The Center relies on enforcement of the ESA to achieve these objectives and, in particular, has advocated extensively for the adoption and implementation of meaningful species recovery plans. The Center is actively involved in species and habitat protection issues and has more than 1.7 million members and online activists throughout the United States and the world.

Defenders of Wildlife ("Defenders") is a non-profit conservation organization headquartered in Washington, D.C. with field offices in Alaska, Arizona, California, Colorado, Florida, Montana, New Mexico, North Carolina, Oregon, Texas, and Washington. Founded in 1947, Defenders is a science-based conservation organization with more than 2.1 million members and supporters nationwide. Defenders is dedicated to the protection of all native wild animals and plants in their natural communities and the preservation of the habitats on which they depend. Defenders advocates new approaches to wildlife conservation that will help keep species from becoming endangered, and it employs education, litigation, research, legislation, and advocacy to defend wildlife and their habitat. Defenders is one of the nation's leading advocates for endangered species and has been involved in issues of Endangered Species Act implementation since the Act was adopted.

The Sierra Club is a national non-profit conservation organization with more than 832,000 members. Headquartered in Oakland, California, the Sierra Club

maintains offices throughout the country. Its mission is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. The Sierra Club relies on vigorous application and enforcement of the ESA to advance this mission.

In the decision below, the district court addressed a challenge to the ESA recovery plan for bull trout and ruled that the Service may ignore the five delisting factors in section 4(a) of the ESA when designing delisting criteria under section 4(f)(1)(B)(ii), 16 U.S.C. § 1533(f)(1)(B)(ii). *See Save the Bull Trout v. Williams*, No. CV-19-184-M-KLD, 2021 WL 2551412, at *9–11 (D. Mont. June 22, 2021). This ruling contravenes Congress's intent and undermines the core purpose of the ESA—species recovery—by threatening to make meaningless a central aspect of recovery planning required under section 4 of the Act. Without ensuring that the statutory delisting factors relevant to the species are considered in recovery plans, such plans could proliferate that at best fail to include criteria that address all threats to a species, and at worst arbitrarily include delisting criteria that lead to the premature removal of Endangered Species Act protections for threatened and endangered species.

This Court has not addressed the question of whether the "objective, measurable" criteria required by ESA section 4(f) must address the relevant statutory delisting factors in section 4(a). As discussed below, the Montana district court's reasoning on this issue was flawed. Furthermore, the district court's ruling is directly contrary to decisions issued by the U.S. District Court for the District of Columbia, which has twice ruled—based on the "clarion" language of ESA section 4(f)—that the delisting criteria in section 4(f) must incorporate the delisting factors in section 4(a). *See Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 133–34 (D.D.C. 2001); *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 110–15 (D.D.C. 1995), *amended*, 967 F. Supp. 6 (D.D.C. 1997). The erroneous reasoning adopted in the Montana district court's ruling, if left uncorrected, threatens to render meaningless a key requirement of recovery plans. Accordingly, this Court should reverse the decision below.

## SUMMARY OF ARGUMENT

Recovery of threatened and endangered species—and the ultimate removal of such species from the Endangered Species Act list—is the cornerstone and ultimate purpose of the ESA. To aid in this recovery, section 4(f) of the ESA requires the Secretary of the Interior, acting through the U.S. Fish and Wildlife Service, to prepare plans "for the conservation and survival" of threatened and endangered species. 16 U.S.C. § 1533(f).

Among other requirements, section 4(f) mandates that these "recovery plans" must contain, to "the maximum extent practicable," "objective, measurable criteria which, when met, would result in a determination, *in accordance with the provisions of this section*, that the species be removed from the list." *Id.* §§ 1533(f)(1), (f)(1)(B)(ii) (emphasis added). Sections 4(a) and (c) of the ESA further provide that a species may be removed from the endangered species list if it is no longer threatened or endangered due to "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1); *see also id*. § 1533(c)(2)(B) (providing that the decision to remove species from the endangered and threatened list "shall be made in accordance with the provisions of subsection[] (a)" of this section). The plain language of section 4(f)'s reference to a delisting decision made "in accordance with the provisions of this section" therefore explicitly links the required "objective, measurable criteria" to the ESA listing/delisting factors in section 4(a). This is because section 4(a), along with sections 4(b) and 4(c), are the "provisions of this section" that dictate the requirements for removing species from the endangered species list. In sum, the "objective, measurable criteria" contained in a recovery plan must aim toward a

delisting determination in accordance with the statutory listing/delisting factors in section 4(a), and, accordingly, must address those delisting factors that are relevant to the species. The district court's contrary ruling should be reversed.

## THE IMPORTANCE OF RECOVERY PLANS AND SETTING APPROPRIATE DELISTING CRITERIA

### I. RECOVERY PLANS ARE A CRITICAL REQUIREMENT OF THE ENDANGERED SPECIES ACT.

Recovery planning is at the heart of the ESA's statutory scheme for survival and restoration of imperiled wildlife. Congress enacted the ESA in 1973 to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The Act defines "conservation" to mean "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3). Thus, as this Court has observed, "the ESA was enacted not merely to forestall the extinction of species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004), *amended on other grounds by* 387 F.3d 968 (9th Cir. 2004). The ESA's recovery mission is even more urgent today than it was when the statute was enacted in 1973, as recent

international assessments have determined that "[a]n average of around 25 per cent of species in assessed animal and plant groups are threatened, suggesting that around 1 million species already face extinction, many within decades, unless action is taken to reduce the intensity of drivers of biodiversity loss." Intergovernmental Science-Policy Platform on Biodiversity and Ecosystem Servs., *Summary for Policymakers of the IPBES Global Assessment Report on Biodiversity and Ecosystem Servs.* 11–12 (2019) (citation omitted) (available at https://zenodo.org/record/3553579#.YWL_QRrMKUk) (last visited Oct. 11, 2021).

Although species recovery is "the cornerstone and ultimate purpose of the endangered species program," the original ESA had no explicit mandate for how to achieve species recovery. Service, *Report to Congress on the Recovery Program for Threatened and Endangered Species* 2 (1996) (*available at* https://www.fws.gov/endangered/esa-library/pdf/1996-1.pdf) (last visited Oct. 11, 2021). Congress therefore added an amendment in 1978 requiring the Secretary of the Interior to develop and implement recovery plans. Endangered Species Amendments of 1978, Pub. L. No. 95-632, sec. 11(5), 92 Stat. 3751, 3766 (1978). The amendment, however, did not include direction beyond the command that the plans provide for "conservation and survival" of species. *Id.* This lack of direction led to plans that included only vague goals and directives and thus did "little to

implement uniform, comprehensive conservation programs to benefit listed species." Daniel J. Rohlf, *The Endangered Species Act of 1973: A Guide to Its Protections and Implementation* 90 (1989) (detailing the inadequacies of early recovery plans).

For example, the early Northern Rocky Mountain Wolf Recovery Plan merely directed federal agencies to "minimize direct, man-caused mortality" by "minimizing or resolving conflicts between wolf recovery objectives and man." *Id.* (quoting Service, *Northern Rocky Mountain Wolf Recovery Plan* (1985)). "This directive obviously did not provide field level guidance on exactly how to minimize wolf-human conflicts. Recovery plans containing only broadly stated goals and vague directives thus do little to implement uniform, comprehensive conservation programs to benefit listed species. Additionally, without specifics recovery plans are difficult to enforce or evaluate." *Id.*

Recognizing that recovery plans were failing to "include consistently criteria, time frames and estimated costs for recovery," Congress again amended the ESA in 1988. S. Rep. No. 100-240, at 4 (1987). In the 1988 amendments, Congress sought to "ensure that plans are as explicit as possible in describing the steps to be taken in the recovery of a species" by requiring the plans include "means by which to judge the progress being made toward recovery." *Id.* at 9. Per

the amendments, recovery plans now "shall" include three elements aimed toward "the conservation and survival" of listed species: (1) a description of the site-specific management actions that are needed for conservation and survival of the species; (2) "objective, measurable criteria" that, when met, "would" result in the determination that a species has recovered sufficiently to be removed from the endangered and threatened species list; and (3) time and cost estimates to carry out the measures needed to achieve the plan's goals and intermediate steps. Endangered Species Act Amendments of 1988, Pub. L. No. 100-478, sec. 1003, 102 Stat. 2306, 2306–07 (1988); 16 U.S.C. § 1533(f)(1).

As a result, today recovery plans are central to meeting the ESA's species-recovery goals. As the umbrella document that guides all conservation planning efforts, "high-quality recovery plans can help shift the focus of recovery efforts beyond stop-gap measures meant to prevent extinction, toward systematic and strategically coordinated actions aimed at alleviating threats and restoring natural ecosystems to a state in which populations are self-sustaining." J. Alan Clark, et al., *Improving U.S. Endangered Species Act Recovery Plans: Key Findings and Recommendations of the SCB Recovery Plan Project*, 16 Conservation Biology 1510, 1511 (Dec. 2002). But in order for these plans to be effective and of "high quality," *id.*, they must actually contain the three elements required by Congress,

and the elements must actually chart a course towards "the conservation and survival" of the species, 16 U.S.C. § 1533(f)(1).

## II. SETTING APPROPRIATE DELISTING CRITERIA IS KEY TO A MEANINGFUL RECOVERY PLAN.

One of the most important aspects of a recovery plan is the Service's designation of the benchmarks it will use in determining when a species may be removed from the endangered species list under 16 U.S.C. § 1533(a)(1) and (c)(2). These "objective, measurable" recovery/delisting criteria, required in recovery plans by section 4(f)(1)(B)(ii), are routinely cited as the reason a species should—or should not—be removed from the endangered species list. *See*, *e.g.*, *Alaska v. Lubchenco*, 723 F.3d 1043, 1049–50 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (9th Cir. 2013) (noting that there was no dispute in the case that a subpopulation of endangered Steller sea lions was "not meeting the recovery criteria set forth in the [recovery plan] and therefore remains endangered"); Endangered and Threatened Wildlife and Plants; Removing the Bald Eagle in the Lower 48 States From the List of Endangered and Threatened Wildlife, 72 Fed. Reg. 37,346, 37,347 (July 9, 2007) (delisting the bald eagle when breeding pairs significantly exceeded the numeric goals set by recovery plans).

The delisting criteria in recovery plans are also used as authority to judge whether a proposed federal action could jeopardize a species' chance at recovery, and to help guide the Service in designating critical habitat for listed species. *See,*

*e.g.*, *Alaska*, 723 F.3d at 1054 (holding that the National Marine Fisheries Service "had to consider whether the proposed action, continued fishing, could prevent the species from achieving the Recovery Plan's goals for delisting"); *Sw. Ctr. For Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1154 (S.D. Cal. 2006), *appeal dismissed and remanded*, 409 F. App'x 143 (9th Cir. 2011) (holding that an incidental take permit was inconsistent with the species' recovery plan's delisting criteria and therefore arbitrary and capricious); *Aina Nui Corp. v. Jewell*, 52 F. Supp. 3d 1110, 1114 (D. Haw. 2014) (noting that the Service's rulemaking for critical habitat for the endangered 'Ewa Plains 'akoko plant was based on meeting the delisting criteria established in the recovery plan); *Ctr. For Native Ecosystems v. Cables*, 509 F.3d 1310, 1316 (10th Cir. 2007) (noting that the Service incorporated the delisting criteria from a working draft of the Preble's meadow jumping mouse's recovery plan into the critical habitat designation for the species).

Because of the central role of delisting criteria in guiding species' conservation and recovery, it is imperative that the delisting criteria set by recovery plans actually set a course towards recovery by addressing each of the threats facing the species. Courts therefore fill a critical role in ensuring that the delisting criteria stated in recovery plans ensure species conservation and survival.

The most important way courts do this is by confirming whether the delisting criteria "specifically assess whether the threats that originally led to a decision to list a species have been remedied in ways that would permit biological recovery of the listed species." *Fund for Animals*, 903 F. Supp. at 111. For example, the court in *Fund for Animals*, 903 F. Supp. at 110–15, carefully parsed the Service's recovery plan for the grizzly bear. The court held that because the delisting criteria in the plan did not address the threats that led to the species' listing, the plan was inadequate under the ESA. *Id.* In particular, habitat loss was a significant threat to grizzly recovery, and the ESA requires the Service to evaluate the present or threatened destruction of habitat when proposing to list and delist a species, 16 U.S.C. § 1533(a)(1)(A), (b), (c). Yet the grizzly recovery plan's only delisting criteria—setting a target for the number and distribution of females with cubs and the annual number of human-caused mortalities—did not directly address grizzly habitat loss. The court accordingly found the plan was inadequate. *Fund for Animals*, 903 F. Supp. at 112.

Similarly, the court in *Defenders of Wildlife*, 130 F. Supp. 2d at 133–34, reviewed the recovery plan for the Sonoran pronghorn. With only 120–250 members of the species still in existence, the Sonoran pronghorn faces threats from drought, degradation of habitat, the diminishing size of the Gila and Sonoyta rivers, and human encroachment. *Id.* at 123. But just like the deficient grizzly

recovery plan, the Sonoran pronghorn plan did not address all of the threats considered in listing the species as endangered, including the threats from drought and habitat loss. Instead, the plan merely allowed for the Sonoran pronghorn to be downlisted from endangered to threatened once population numbers reached a certain threshold. The court found that the plan was inadequate for failing to address the threats considered in listing the species, and for failing to plan for the species' removal from the endangered species list altogether. *Id.* at 133.

This type of careful judicial review is essential to ensure the proper functioning of the ESA's recovery planning requirements. If the *Fund for Animals* court had held the substance of the grizzly bear plan's measures for recovery did not have to match the threats facing the species, it might have led to a situation where recovery planning efforts improperly focused on numeric markers (the number of females with cubs) that could mask or obscure the real barriers to the species' recovery (habitat loss). The Service's own Recovery Planning Guidance explains the fallacy of this approach, admonishing that "merely increasing a species' numbers, range and abundance does not ensure its long term health and sustainability; only by alleviating threats can lasting recovery be achieved." Nat'l Marine Fisheries Serv. & U.S. Fish & Wildlife Serv., *Interim Endangered and Threatened Species Recovery Planning Guidance, Version 1.3* § 1.3.2 (2010) (available at https://www.fws.gov/endangered/esa-library/pdf/NMFS-

FWS_Recovery_Planning_Guidance.pdf) (last visited Oct. 11, 2021). The Guidance explains:

> The tacit assumption has been that the species' population parameters serve as surrogate indicators of the status of the species, including control of threats. Although this assumption may have been accurate in some cases, it has not in others. For example, population augmentation through captive breeding and re-establishment may increase a species' population numbers while a threat continues unabated; however, population declines will recur once augmentation ceases. In another example, take of a species, either direct or via habitat alteration, may have been curtailed by listing the species and populations may thus have rebounded, but the threat of take could recur after delisting if adequate regulatory mechanisms have not been put in place. *Thus, evaluating a species for potential reclassification or delisting requires an explicit analysis of threats under the five listing factors in addition to evaluation of population or demographic parameters. By establishing criteria for each of the five listing/delisting factors that are currently relevant to the species, the Recovery Program for the species is more likely to ensure that the underlying causes of decline have been addressed and mitigated prior to considering a species for delisting.*

*Id.* § 5.1 at 17–18 (emphasis added); *See also* Jason M. Patlis, *Recovery, Conservation, and Survival Under the Endangered Species Act: Recovering Species, Conserving Resources, and Saving the Law*, 17 Pub. Land & Resources L. Rev. 55, 65 (1996) (explaining why "[p]opulation abundance alone . . . is not a sufficient criterion for recovery" because even when a population's abundance is sufficient, threats and adverse impacts "may quickly reduce it below minimum viability").

Instead of accepting the Service's myopic focus on numeric markers, however, the *Fund for Animals* court's order required the Service to prepare a grizzly bear recovery plan that responded to the acknowledged threat of habitat loss by including habitat-based delisting criteria with minimum habitat security parameters for grizzly recovery. *Fund for Animals*, 903 F. Supp. at 112. The revised grizzly recovery plan met the court's requirements. *See* Service, *Grizzly Bear*, *Ecosystem-Specific Recovery Materials* (available at https://www.fws.gov/mountain-prairie/es/grizzlybear.php) (last visited Oct. 11, 2021); Jordan Curnutt, *Animals and the Law: A Sourcebook* 409–10 (2001) (noting that the Service subsequently prepared a plan addressing the defects identified by the court, including establishing habitat-based delisting criteria).

Similarly with the Sonoran pronghorn, had the *Defenders of Wildlife* court held that the recovery plan need not take into account the threats to the pronghorn, the recovery plan would have continued to focus shortsightedly on reaching a target population without addressing the frontline threats to the Sonoran pronghorn—drought and habitat loss. Instead, today the Sonoran pronghorn's revised recovery plan includes detailed criteria for delisting that specifically address these threats and therefore ensures they are ameliorated before the Service may remove ESA protections. Service, *Recovery Plan for the Sonoran Pronghorn* 106–08 (2016) (available at

https://www.fws.gov/southwest/es/arizona/Documents/SpeciesDocs/SonoranPronghorn/FINAL_Sonoran_Pronghorn_Recovery%20Plan_2nd%20Revision_11-16-16.pdf) (last visited Oct. 11, 2021) (explaining that the Sonoran Pronghorn may not be delisted until a minimum of 90% of current habitat is protected and the habitat includes key features such as water sources). Judicial review of the content of the delisting criteria in recovery plans to ensure they address the relevant delisting factors in section 4(a) is thus crucial to ensuring that the "cornerstone and ultimate purpose" of the ESA—species recovery—is achieved. Service, *Report to Congress on the Recovery Program for Threatened and Endangered Species* 2 (1996).

The recovery plan for bull trout at issue in this case has all the hallmarks of the type of vague, meaningless plan that Congress sought to prevent through the 1988 amendment to the ESA. In the same way the deficient Northern Rocky Mountain Wolf Recovery Plan only vaguely required agencies to "minimize direct, man-caused mortality," the bull trout plan requires that "primary threats" be "effectively managed," but provides little guidance or clarification of what this means in practice. Service, *Recovery Plan for the Coterminous United States Population of Bull Trout* 46 (2015), ER-98. It further fails to include any delisting criteria that directly address the primary threats to bull trout: historical habitat loss and fragmentation, interaction with nonnative species, and barriers to fish passage.

*Id.* at ER-43 (acknowledging that these are "the most significant primary threat factors affecting bull trout").

If this Court were to hold that the delisting criterion in the bull trout recovery plan is adequate, and that the Service has no obligation to consider the established threats facing the species when developing delisting criteria, it would stymie courts' ability to ensure that the mandatory requirements of the ESA are being carried out for the bull trout and other imperiled species, and would effectively undo Congress's repeated efforts to strengthen recovery planning requirements. Plans could proliferate that at best fail to include criteria that address the primary threats to a species and provide a roadmap to recovery, and at worst arbitrarily include goals that set imperiled species on a course towards extinction. Conservation Amici therefore respectfully request that this Court take this opportunity to ensure that the ESA's recovery planning requirements are meaningfully enforced by holding that the delisting criteria contained in a recovery plan must address the threats that led to the species' listing in the first place.

## ARGUMENT

The requirement that the "objective, measurable" delisting criteria in recovery plans address the threats to the species is contained in the plain language of ESA section 4(f)(1)(B)(ii). The Montana district court erred in holding otherwise, and its decision should be reversed.

ESA section 4(f)(1)(B)(ii) does not simply require the Service to include *any* delisting criteria whatsoever in its recovery plans. Congress did not provide the Service with latitude to, say, create a delisting criterion for bull trout that bore no relation to the threats actually facing bull trout. Rather, Congress cabined the discretion of the Service in creating delisting criteria by specifying that it include "objective, measurable" criteria that, "when met, would result in a determination, *in accordance with the provisions of this section*, that the species be removed from the list." 16 U.S.C. § 1533(f)(1)(B)(ii) (emphasis added). Section 4(f)(1)(B)(ii)'s reference to a delisting decision "in accordance with the provisions of this section," *id.*, is an explicit reference to subsections 4(a), (b), and (c). These subsections dictate the Service's decision-making process for listing and delisting species, and require the Service to consider five enumerated statutory threat categories in listing and delisting a species as threatened or endangered: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1); *see also id.* § 1533(c)(2)(B) (providing that the decision to remove a species from the endangered list "shall be made in accordance with the provisions of subsection[] (a)" of this section); *Friends of Blackwater v. Salazar*, 691 F.3d

428, 436 (D.C. Cir. 2012) (recognizing that "the Service is to apply the same factors to listing as to delisting decisions"); *accord* 50 C.F.R. § 424.11(e)(2). Hence, a recovery plan that recognized habitat loss as a major threat to the bull trout, but made no effort to create a delisting criterion addressing that threat, could not pass muster under the plain terms of the statute, because without addressing habitat loss, the delisting criteria would not permit the species to be removed from the endangered species list in accordance with ESA section 4(a). *See Fund for Animals*, 903 F. Supp. at 112.

This explicit link in section 4(f) to the "provisions of this section"—i.e., the provisions in section 4(a), (b), and (c)—was explained by the D.C. district court in *Fund for Animals*. As that court made clear:

> Congress has spoken in clarion terms: the objective, measurable criteria must be directed towards the goal of removing the endangered or threatened species from the list. Since the same five statutory factors must be considered in delisting as in listing, 16 U.S.C. § 1533(a), (b), (c), the Court necessarily concludes that the [Service], in designing objective, measurable criteria, must address each of the five statutory delisting factors and measure whether threats to the [species] have been ameliorated.

903 F. Supp. at 111; *accord Defs. of Wildlife*, 130 F. Supp. 2d at 133; *see also Sw. Ctr. for Biological Diversity v. Babbitt*, No. 98-372 TUC JMR, 1999 WL 33438081, at *6 (D. Ariz. Sept. 3, 1999) (upholding Service determination that it was not practicable to formulate delisting criteria but only after determining that the agency's plans for further recovery research were "relevant to the five statutory

[listing] factors of Section 1533(a)(1)"); *Wildearth Guardians v. Salazaar*, No. 09-CV-1893, 2009 WL 6443120, at *3 (S.D. Tex. Dec. 7, 2009) ("In designing objective, measurable criteria, the [Service] must address each of the five statutory delisting factors provided in the ESA and measure whether threats to the species have been ameliorated.").

In holding to the contrary, the Montana district court did not address the statutory language in section 4(f)(1)(B)(ii) directing that the "objective, measurable" delisting criteria must be aimed toward the goal of attaining a delisting determination "in accordance with the provisions" of section 4. *See Save the Bull Trout*, 2021 WL 2551412, at *9–11. Instead, the district court relied on (1) a district of Arizona opinion that similarly did not parse the plain language of the statute; and (2) the general notion that recovery plans are non-binding. Neither rationale holds water.

First, the district court cited to *Center for Biological Diversity v. Zinke*, 399 F. Supp. 3d. 940, 949 (D. Ariz. 2019). *Save the Bull Trout*, 2021 WL 2551412, at *10. But the *Center for Biological Diversity* court followed the D.C. district court in *Fund for Animals* in holding that a recovery plan's delisting criteria must address the threats identified by the Service. *Ctr. for Biological Diversity*, 399 F.

Supp. 3d at 949–50.[2] And while the *Center for Biological Diversity* court also held that the delisting criteria in recovery plans do not need to be based on the best available science—even though the delisting criteria in section 4(a) must be (*see* section 4(b)(1)(A), imposing a best-available-science requirement on listing and delisting determinations), *id.* at 949—it did not parse the plain language of section 4(f) explicitly linking the delisting criteria in section 4(f) to the delisting requirements in sections 4(a), (b), and (c). That court instead reasoned that section 4(f) itself "does not include a 'best available science' mandate," *id.* at 949, without examining section 4(f)'s explicit incorporation of other section 4 provisions that *do* include a best-available-science mandate.[3]

---

[2] Amici Center for Biological Diversity and Defenders of Wildlife are plaintiffs in *Center for Biological Diversity*, 399 F. Supp. 3d. 940. The court in that case has since affirmed on summary judgment that "[a] challenge to a recovery plan is . . . reviewable if the challenge asserts that the agency failed to include site-specific management actions and objective criteria to address a problem the agency itself identified, without offering an explanation as to why it was not practicable for the agency to do so." *Ctr. for Biological Diversity v. Haaland*, No. 4:18-CV-00047-TUC-JGZ, 2021 WL 4806846, at *4 (D. Ariz. Oct. 14, 2021) (internal quotations omitted).

[3] The Ninth Circuit has not had opportunity to weigh in on the question whether delisting criteria in a recovery plan must be based on the best available science. Nevertheless, for the same reason that section 4(f)(1)(B)(ii) necessitates that delisting criteria address the relevant listing factors under ESA section 4(a), it equally necessitates that the delisting criteria be based on the best available science pursuant to ESA section 4(b)(1)(A); both section 4(a) and 4(b)(1)(A) are "provisions of this section" that govern delisting. 16 U.S.C. § 1533(f)(1)(B)(ii). Indeed, it would make no sense for Congress to have required that both listing and

Second, the district court found that because recovery plans are not binding in all respects and the Service has discretion in crafting provisions in the plans, the plans need not take into account the section 4(a) listing factors. *Save the Bull Trout*, 2021 WL 2551412, at *11 (citing *Conservation Congress v. Finley*, 774 F.3d 611, 614 (9th Cir. 2014) and *Friends of Blackwater*, 691 F.3d at 432–34). There are several fundamental flaws in this analysis.

First, section 4(f) explicitly provides that the Service "*shall* develop and implement" recovery plans for listed species. 16 U.S.C. § 1533(f). As the Supreme Court and this Court have repeatedly reaffirmed, "shall" is the unequivocal language of command. *See, e.g., Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) (noting that "shall" is "mandatory language" that presumptively "connotes a requirement") (collecting cases); *United States v. Monsanto*, 491 U.S. 600, 607 (1989) (recognizing that by using "shall," "Congress could not have chosen stronger words to express its intent" to impose a mandatory requirement); *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, 837

---

delisting decisions must be based on the best available science while allowing some other (undefined) standard to guide the issuance of "objective, measurable" criteria for determining when a species has recovered and should be delisted. Not surprisingly, therefore, a careful parsing of the statutory language belies any such counterintuitive reading. Conservation Amici therefore agree with Appellants that this same statutory language requires delisting criteria to be based on the best available science. *See* 16 U.S.C. § 1533(b)(1)(A); Appellant's Opening Br. at 55–60 (Dkt. 10).

F.3d 1055, 1064 (9th Cir. 2016) ("'Shall' means shall." (internal quotations omitted)). Consequently, although the Service may have latitude in carrying out its duties under section 4(f), any notion that the provision imposes no binding obligations on the Service with respect to the development and implementation of recovery plans cannot be reconciled with the plain terms of the statute.

Second, irrespective of whether the Service has some latitude in crafting and implementing provisions of the plans, it certainly does not follow that the Service may ignore the statutory requirements that set the bounds on that discretion. "It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking." *Bennett v. Spear*, 520 U.S. 154, 172 (1997).

For example, in *Bennett*, the Supreme Court held that although the Service maintained some discretion as to the ultimate substance of a critical habitat designation, it could not ignore the statutory requirement that it "tak[e] into consideration the economic impact, and any other relevant impact" when making the designation. *Id.* The Ninth Circuit has extended this rationale in *Association of California Water Agencies v. Evans*, 386 F.3d 879, 884 (9th Cir. 2004), to hold that the scope of such review extends to whether the methodology used in the Service's economic impact assessment was "proper." *See also Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 139 S. Ct. 361, 371 (2018) (explaining that

a court may review an ESA critical habitat designation for whether the Service had considered all relevant factors and whether there had been a clear error of judgment). Similarly here, notwithstanding the Service's discretion to craft a recovery plan's substance, courts may adjudicate whether a recovery plan's delisting criteria comply with the statutory requirements of section 4(f), including, at a minimum, whether they are "objective" and "measurable," 16 U.S.C. § 1533(f)(1)(B)(ii), and whether they are adequately aimed toward the goal of attaining a delisting determination "in accordance with the provisions" of section 4, including by addressing the statutory delisting requirements delineated in subsections 4(a), (b), and (c), *id.*

Moreover, although the D.C. Circuit, in a split opinion, has held that all of the delisting criteria in a recovery plan need not be satisfied when the Service makes a decision to remove a species from the list of endangered and threatened species—for instance, where a recovery plan "is overtaken by events" such that its delisting criteria become "irrelevant"—*Friends of Blackwater*, 691 F.3d at 432–34, that court has not called into question the validity of the D.C. district court rulings reviewing whether recovery plans adequately satisfy the section 4(f) requirements or are otherwise arbitrary or capricious. To the contrary, the panel majority explained that:

> [n]or do we doubt § 4(f)(1) of the Act imposes mandatory obligations upon the Secretary. The Secretary shall, for example, develop a

> recovery plan for an endangered species, 16 U.S.C. § 1533(f)(1), which plan shall include "objective, measurable criteria," *id*. § 1533(f)(1)(B)(ii). The Secretary, moreover, must implement the plan. *Id*. § 1533(f)(1). That is, as long as a species is listed as endangered, the agency is obligated to work toward the goals set in its recovery plan.

*Id*. at 437. The D.C. Circuit moreover stated that a recovery plan's objective, measurable criteria are meant to be "predictive of the Service's delisting analysis" under section 4(a)(1) and to "serve as proxies, tailored to what is known about the particular species, standing in for the statutory factors of § 4(a)(1) that ultimately control the Secretary's delisting decisions." *Id.* at 433. Thus, *Friends of Blackwater* recognized that Congress intended a recovery plan's objective, measurable criteria to assess progress toward an ultimate delisting determination under the section 4(a) factors. *See id.* That same principle animates the holdings in *Fund for Animals*, 903 F. Supp. at 111, and *Defenders of Wildlife*, 130 F. Supp. 2d at 133. In sum, the Montana district court's ruling is contrary to the plain language of section 4(f), is in tension with the cases it purports to rely on, and it should be reversed.

## CONCLUSION

It is critical that the delisting criteria in recovery plans set our nation's imperiled species on a course towards recovery by addressing the threats causing their endangerment. Robust judicial review is a crucial part of enforcing this mandate. For the foregoing reasons, Conservation Amici urge the Court to reverse

the ruling of the district court, and ensure that the protections of the Endangered Species Act are upheld.

Respectfully submitted,

Dated: November 8, 2021

s/ Elizabeth B. Forsyth
ELIZABETH FORSYTH
TIMOTHY J. PRESO
Earthjustice
*Attorneys for Conservation Amici*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

Pursuant to Federal Rule of Appellate Procedure 29(a)(5), I hereby certify that this brief complies with the word limitations set forth in Federal Rule of Appellate Procedure 29(a)(5), and Circuit Rule 32-1(a). This brief is proportionally spaced, has a typeface of 14 points, and contains 6003 words.

DATED: November 8, 2021

s/ Elizabeth Forsyth
ELIZABETH FORSYTH